Case number 24-1164, Independent Market Monitor for PJM conditioner versus Federal Energy Regulatory Commission. Mr. May, for the conditioner. Mr. Perkins, for the respondent. Mr. May, all parties approved. Good morning, Mr. Mays. Good morning. May it please the court. My name is Jeffrey Mays, counsel for the Independent Market Monitor for PJM. I requested two minutes of my time for rebuttal. Section 4G states, Section 4G of the tariff, the market monitoring unit may, as it deems appropriate or necessary to perform its functions under this plan, participate consistent with the rules applicable to all PJM stakeholders and stakeholder working groups, committees, or other PJM stakeholder processes. Section 4G is there to ensure that the market monitor can perform its core functions without interference. Section 4G recognizes that market participants could prevent the market monitor from providing its recommendations on market design by excluding it from stakeholder processes where market design proposals are developed. The market design rules are complicated and must reflect competitive principles as economists define them. Before you get too deep in the merits, can you talk for a little about standing? Right. Our standing is because there is a tariff provision law that protects the ability of the market monitor to perform a core function. And that core function requires it to participate in PJM stakeholder meetings like the liaison committee. And that provision was violated by denying the market monitor the ability to attend at the liaison committee. And the FERC did not enforce that rule when it was requested to on complaint. Is this an informational injury theory or a theory that the organization was prevented from doing its job? The injury was a failure to enforce a provision of the law that protects it. I realized that in our briefing, we tie that theory to other cases where volunteer organizations that have organizational activities and wanted information from the government on claim standing and were granted standing based on that theory. But that's not really our case. Our case is that there is a provision of the law that says that we get to attend these stakeholder meetings like the liaison committee. And that provision was violated. And I don't think the court actually has to determine issues in the broader realm of standing about whether this is access to information or these other issues that came up in cases that were – the case was far weaker in the sense that it wasn't a specific legal provision designed to protect that specific entity. What is the specific provision that you think gives them the right to be at these meetings? So, the specific provision is section 4G. So, section – the PJM tariff includes attachment M, which is basically the charter that outlines the functions and responsibilities of the market monitor. And the market monitor is not a discretionary entity. PJM is required to have a market monitor in order to be an RTO because it's considered that important to have confidence that PJM organized wholesale markets would create competitive prices that it could rely on as just and reasonable. But the market monitor exists only because the members decided to create that position and they define what it involves and the definition. I'm not seeing a definition that includes decision-making or decision-making processes, which is what the agency and the other side say. Where do they have – suppose there was a specific provision in the tariff that said they had no right to attend these meetings. If there was a provision that said the IMM did not have a right to attend the meetings, we wouldn't be here to enforce it. Okay. Now, that's essentially what we're talking about because the other side and FERG both say when you read the tariff, they do not have a right to participate in liaison committee meetings. They're not involved in – the liaison committee is not involved in decision-making. Right. Okay. So, I think that Commissioner Christie actually addressed that. Commissioner Christie was filed a dissent in the order that denied our complaint. Commissioner Christie is very familiar with PJM because he was very active and played a leadership role in the organization of PJM States. And so, for many years, he's very familiar with PJM Affairs. Until recently, he was actually the chair of the commission. And he wrote a dissent. The idea that the liaison committee does not identify or review any issues related to the PJM tariff or markets seems nonsensical to say in the least. And would immediately – excuse me – would undoubtedly be a surprise to those members of the liaison committee who undoubtedly believe that they are addressing and identifying issues of consequence to the PJM tariff and markets to the PJM board. Moreover, it is contrary to the evidence presented by the IML. I'm not sure what that says. It doesn't say anything about the question I'm asking. That is, the liaison committee has no authority to deal with the stakeholder decision-making questions. And there's nothing to the contrary – nothing in what you just said is the contrary. And even if this fellow has been around forever and knows everybody everywhere, that doesn't mean he's an authority on this question. You look at the tariff. The tariff does not give authority for the liaison – doesn't say anything about the liaison committee has the authority or does engage in the decision-making process. So, both the commission and the other side say they're not involved in a stakeholder interest that we're going to recognize as required under the tariff that gives them a right. Now, I mean, I realize you – and it's tricky in standing. I realize you can make an argument. Well, they can make the arguments not completely off the wall to suggest this protects an interest that is important to them, and so you shouldn't decide the merits when you're dealing with standing. That's one way to go. You can say, so they have standing to make that claim, and then we get to the merits, and you lose anyway. So, I'm not sure where you are in this. You're saying it's absolutely clear in standing because where? What? I think it's absolutely clear because regardless of what the committee is, this committee is, it's part of the pre-jump stakeholder process. Even the law decided by the other side recognizes that education and review and addition decisions are part of the process. Nowhere does it say that every single meeting has to be decisional, and in fact, many other examples of committees are not themselves decisional. One of them that's very important is the cost development subcommittee, which develops the rules for offers and particularly in the energy markets. And that rule does – that committee itself does not actually make decisions, but it's very influential in what the ultimate market rules will be. It's critical for market design. There's no doubt that there may be things that happen that cause people to think differently about decisions. That doesn't make it a decision-making group. That makes it part of the process. That makes it part of the stakeholder process. No, it doesn't, not if the organization that's hired you said it's not part of the process. That's what's so ironic here is the market monitor has been created by these people, and they're telling him, no, this is not the way that particular group operates, and it's not the way we want it to operate, and the law does not require it to operate in the way that the market monitor says gives him standing. Well, I think this goes straight to the problem, which is that there's excessive deference being paid to PJM here, which it's pretty clear from the record that PJM wasn't only making the decisions. It was making it at the behest of the members. That's the track record of how, after 10 years of participating in liaison committees, how the market monitor was suddenly excluded. Because the members decided they didn't want the arrangement, and the law doesn't require it. It does require it. That's what Section 4G says. Section what? Section 4G requires it. Section 4G requires that the market monitor, which makes the determination of what's appropriate and necessary, may participate in PJM stakeholder meetings, including committees like the liaison committee, which is a committee because it's called the liaison committee, and that it gets to make that decision. And the reason it does that is because it was anticipated that exactly this attempt would be made to exclude the market monitor from committees and thereby prevent it from carrying out its role to recommend changes in the market design. And if you look at what the PJM board requires the market monitor to do, Section 22 of the Market Monitoring Service Agreement, which is included in the addendum and which is part of the agreement, what the market monitor is required to do by the PJM board, it says quite plainly there that they will evaluate our performance by how the quality and quantity of our efforts to make recommendations and influence the market design, and that includes participation in the stakeholder process. So we're required by the board to do it. We're required by the PJM CAF to do it. We're required by the FERC's regulations to do it. We're required by Order 2000 and Order 719, which define the market function and require it to be part of all RTOs, not just PJM. And all of this, of course, emanates from Section 205 of the Federal Power Act, which requires that the FERC determine that prices are just and reasonable. And if it's going to rely on the rules of these organized wholesale markets to determine just and reasonable prices, then it provided for the market monitor to be there in the process to develop those rules. And that's an essential part of what an RTO is. And the function is not voluntary. It is not at the discretion of PJM. It's not even at the discretion of the PJM board. All right. Thank you. Mr. Perkins? May it please the court, Jason Perkins for the commission. I just want to start by taking a little bit of a step back on the standing point. As you see from the first page of PJM's answer, page 42 in the joint appendix, there are about 400 meetings a year that they consider to be part of the stakeholder process. The market monitor says that they attend 100 or more of those meetings. And here in this case we're talking about four additional meetings beyond that. And so what we were hoping to see in the opening brief in the declaration supporting it is what exactly the four meetings matter to the overall perspective of what the market monitor does. And beyond stating that it would play defense against bad ideas in those meetings, essentially, we didn't see a whole lot more than that. So that's the basis of our standing concern. It seems there's a hit of paranoia with this IMM that, you know, if it doesn't hear something, it can't respond to it. And it's got a million ways to get the information if it thinks it's been denied some sort of information. Right. Robust informational tools, as spelled out in the tariff to get all the information it might need. The problems here seems to be, at least from the record, that the set of meetings that are described in paragraph 86 of the commission's order, the fact that the PJM board has successive meetings with different groups that are not open to the other groups, seems to be the basis of the concern here. But as the court noted, there's plenty of information, well, Washington information that the market monitor can't get. It's not that hard to imagine a bureaucratic arrangement, right, where there's a formal meeting where people go through motions, and then there's a private informal meeting where the decision makers really decide what they're going to do. Sure. I mean, it didn't strike me as an off-the-wall concern. In putting those terms, if all of the negotiations happen behind closed doors and what happens in public is just the end vote of how it's actually formally approved, that's one thing. But here, as you saw in the chart in our brief, there's a robust process that happens when it comes to identifying specific tariff provision proposals, working them through the process, and having votes. Yeah, it looked that way on paper. But can you just give me the record sites for the 410 and 4? Sure. That is page 42 of the joint appendix. It is the first page of the PJM answer, and it says, in furtherance of the commitment to independence and transparency, PJM hosts more than 400 stakeholder meetings on an annual basis. And then in the addendum, the declaration, that's towards the end of the Bowering Declaration, talks about the, yes, Paragraph 19. The monitors declaration. The monitors, that's right. That's right. Yeah, today in 2024, the market monitors attended more than 100 stakeholder meetings. Great. Do you have any explanation for the tenet of the dissent? I thought it was, you know, an overreaction to a fairly small Bower issue. Well, the then Commissioner Christie, former Chairman Christie, has had perspective on this, and I think the real key to it is at the end of the dissent, where it talks about Paragraph 14 on Joint Appendix 115, that the market monitor is a very important, has explicit obligations, is very important, it is very specific and vitally important duties. We feel strongly that the market monitor should have any information. You can do your own market monitoring. Do any of the RTOs do that? So the market monitoring function is a requirement of all the RTOs. They all do it. They do it in slightly different structures and different ways. Does any RTO do it in-house? I think we're beyond our record, but I do believe some do it in-house. Maybe the California one does it in-house, I think. So it is possible to have it be done in-house or be done by an external consultant, and I think it's even possible to do both. So there are many different ways to get it done. A significant part of your argument, if I understood it correctly, was that the Liaison Committee does not engage in decision-making. What is your strongest authority for that point? That would be the Liaison Committee charter that describes what the Liaison Committee does, and it says that the Liaison Committee on page 1 of the charter is the Joint Appendix 126. The BGN Liaison Committee will not have the authority to vote on or decide any matters or to act as a substitute for the normal decision-making processes of the Members' Committee or the Board of Managers. If they were to act in decision-making, that's a violation of their own charter. But they are meeting with the Board, who is the decision-maker, right? Right. And I think it's mentioned in the declaration. And stuff on the agenda can include market design issues. Right. And there are two meeting agendas that were linked in that PJM answer. It's Joint Appendix 47 where they're linked, and they talk through big-picture issues like the capacity auction results, the winter storm, transparency, PJM, resource adequacy, and the market monitors contract. So those are all big-picture items at PJM. The membership, last check, the PJM website said it was more than 500 voting members, 1,100 total members. It's a large group, for sure. But this is the opportunity for the membership to have their comments and their feedback face-to-face with the Board, and that's as the commission describes in detail in the orders. It seems like that could be part of a decision-making process. In theory, it could. If there was no – Part of my decision-making process is I have meetings with my law clerks for argument. They have no authority to decide cases, but that meeting is part of my process. Sure. And if the PJM Board thinks about what was discussed in the meeting, it's in their mind. Like, we don't dispute that. I think where our dispute as to the merits issue, as we talk about on page 30 of our brief, is that the market monitor appears to believe that any discussion of issues, therefore, belongs in the stakeholder process. And so no discussion of issues can happen outside of the market monitor's purview. And I think that's where we depart on the merits, because discussion of those high-level issues, if they're not tied to a specific decision PJM is going to make, is something that can happen as a function of two-way communication between the members and the Board they elect. So we don't seem to see a problem there. So you're distinguishing between affecting decision-making and actually deciding. In other words, three law clerks, four law clerks in the chambers may or may not affect the judge's decision, but the one thing we know is they can't make the decision. That's right. That's your argument. Essentially, yes. There can be a discussion of the capacity market option between the members and the Board, but if they are trying to change the rules of the auction to affect it in the public transparent process of stakeholder process. Why isn't, why don't they have enough to get them past the standing position on the plan and the tariff says that the market monitor unit may, as it deems appropriate, necessary to perform its functions, participate consistent with the rules applicable to all PJM stakeholders and stakeholder working groups, committees, or other PJM stakeholder processes. They're reading that sweepingly. They're saying anything that looks interesting and we might hear some juicy stuff, we can be there. At least that's essentially the way I read their position. If it might bear some fruit, if they might affect decision-making, then we should be able to be there. Well, I think that for purposes of standing, we would assume that they're right about the merits and the formulations. We're talking about standing now because you can, you're not supposed to decide the merits in the standing inquiry. Exactly. The formulation being there needs to be an actual or imminent invasion of a legally protected concrete and particularized interest. So legally protected, that would be the merits question. So we assume that they're right about that. Particularized, it deals with the market monitor. So this provision is specific to the market monitor. So we can see that that's particularized, but where's concrete in that? What does it matter if they're not there? That they were excluded in 2018. I'm sorry. I mean, it is a concrete injury if you assume they have preserved an informational injury claim. They claim a right to information under the tariff. And we assume that that's right. And the tariff has legal effect. And I mean, under the informational standing cases, the tariff makes that claim concrete. Makes the injury concrete. If there's a perceptible impairment to their activities, and you look at the Center for Biological Diversity, recent Center for Biological Diversity. You're kind of shifting from informational injury to Hayden's. I agree with you. I think that's their claim though, right? That they are, I mean, citing the PETA case, an anti-vivisection society case, that seems to be the claim. That they are. The most charitable reading of their brief is they have two separate theories. One is that one and the other, which may or may not be preserved, is just a pure informational injury. It's just like a FOIA plaintiff. If I say I have a right to get some information and I haven't gotten it. And in those cases, if you look at the Aikens case, the public citizen case, there is still some sort of interest identified by the plaintiff there. Be it in voting, be it in the participation in judicial selection. Like there is something else that can be identified as being potentially impaired. So I think you still have perceptible impairment in those cases. And the transunion case gets right to it by saying that an asserted informational injury that causes no adverse effects cannot satisfy article three. So that's the 594 U.S. of 442. Like that seems to be the standard that would need to be satisfied. Adverse effects. We don't see it here and that's our concern. And isn't there a provision at 5B1-2 that gives IMM the right to force disclosure? And why can't we compare that as a provision requiring the information be given to 4G, which doesn't have any requirement language. It's requesting other information in 5B1. Request for additional data on page 21. If the Mark-Martin unit determines additional information is required, is it that piece? Yes. So, right. There are reasonable requests of the entities possessing such information. I think that that is, in general, a possibility for getting information that's pretty broad. I don't know how, I don't know if that's been invoked or how it would be  but that is an opportunity to ask for anything that they feel like that they need. But what I'm saying is that shows you an informational injury. 5G doesn't. I see. That's already been established here or that they could ask for the  Well, they can ask for it, but they're not entitled to it. Sure. Sure. And they need to be to have an injury that we can recognize. Any further questions? Thank you for your time. All right.  Mr. Nadell. Good morning, may it please the court. My name is Stephen Nadella with PPL electric utilities on behalf of the intervening transmission owners. So we are a member of PJM. I've been for a long time and we participate both in the liaison committee and in a broader stakeholder process. So there's no doubt in this case that the IMM has the right to access stakeholder process meetings and process when and where market rules are  That's that's not an issue. What is the issue is whether this liaison committee is part of that process. And it's simply not what it is, is a meeting between the PJM board separate decision-making process and the PJM membership where they have the opportunity and the the space to information and transparency. That's all right in there in manual 34, section 15 describes what the liaison committee is. You also have to look,  to the liaison committee charter, which explicitly excludes non-members of PJM from the meeting. So not just the market monitor, but also the state commissions, also the press, also the commission, the federal energy regulatory commission. When the liaison committee is meeting with the board, they're only discussing issues of communication. They're not actually discussing proposals. No, they can market design. No judge catches. They can, they can discuss anything that's on the agenda, which would include market design.  They certainly are involved in matters that may affect decisions by those who make decisions. So that can't be disputed.  that's not disputed judges. The difference is we have two decision-making bodies here. We have the stakeholder process that culminates in the members committee, and there's adequately described in manual 34 and we have the PJM board and they have overlapping, but distinct roles. So the liaison committee is primarily designed as a liaison, literally in the name between those two bodies, between the members on the one hand and the PJM board on the other. And the end result of the liaison community cannot ever be a decision that controls those other two that you referenced.   there is no result. That's the heart of your argument. I don't know where that puts me at standing,  but in terms of the merits, that's a strong position. The liaison committee is not involved in decision-making and that seems clear. And I don't know how a market monitor can claim more than what it was created to do. There's no doubt that they may hear some things that are of interest to them. If they were allowed to sit in the committee, that's, that's fine because you hear things that, you know, may later affect the decisions of the board and other stakeholders. But I don't know how that gets them to a position that therefore it gives us a right to sit in all those committees. That's exactly right. They're also not entitled to participate in the other closed meetings of the board. The board has the opportunity to collect information from a variety of parties. Then it retreats to its own confidentiality and as a decision-making process. What's the point of the liaison committee meetings, unless they are in some broad sense related to the decision-making process through which the board does its business. I mean, right. It's not a debating society. It's not a social club. It's related to the board's official duties in a lot of ways. It is a debating society, but you're right. The decision-making process of both the membership and the board is very much on the table at the liaison committee. You can get that from any of the, any of the published agendas. However, there are other things discussed as well. PJM is a, is an organization with, with its own private contracting, with its own governance, with its own management. All of that is available for discussion. The board is elected by the membership. The liaison committee meeting is an opportunity for them to receive feedback and, and frankly, opinion from their membership. Because you have disparate parts who don't want to be left out. This is what you can bring them together in this room under the heading of liaison committee, and they can yell at each other and make their points and leave feeling like I had my say. Exactly. And the other interested parties have their opportunity as well. You know, if you do read a former chairman Christie's dissent, he had a strong opinion about OPSI, which is the state commissions. They have a private meeting with the board. Market monitor has a private meeting with the board. The board obviously meets amongst themselves a month meets with PJM staff. Members aren't included in any of that. We want our own meeting where we, where we can speak frankly as well. All right. Thank you. Does he have any time left? All right. Take one minute. All right. So to address some of the points that were made about alternatives, there is no alternative to being at the meeting and hearing what said. It's not about so much about us receiving information as our ability to provide our information. We have a reporting function where we report details about how the PJM market operates. These are often referred to in stakeholder meetings, sometimes incorrectly and for support points they don't support. And so when the market monitor is present, we are able to explain that, but the information flow and market design is about our recommendations on what the market design should be. The idea that the liaison committee would meet and discuss market design issues, which no one here has said is otherwise. And that then when it goes and meet separately as a board to make a decision that it would not be impacted by what it is on committee is, is as Christie said, nonsensical to say the least. That is not what is happening. It is part of the decision process. Just because the board doesn't give its decision at liaison committee meeting doesn't mean that liaison committee does not contribute to the decision. I mean, if you consider in this proceeding, we're having oral arguments, but you're not going to decide this case here. I believe this is part of your decision making process, but when you go meet, we're not going to be there. We wouldn't assert the right to be there, but we believe that oral argument and our pleadings, that those would be part of the decision making process. It's no different. When the liaison committee meets, discuss market design issues, and then the board goes off and votes on things. And, but why is that important particularly for the board? Why is this of all the hundreds of meetings? Why is this the meeting that they want to exclude the market from? Well, this is a meeting you want to attend. You're out of time. There's no more questions. Okay. You're out of time.
judges: Henderson; Katsas; Edwards